[PHILADELPHIA, FEBRUARY 4TH, 1839.]

## The COMMONWEALTH *against* SWIFT, Esq.

#### QUO WARRANTO.

Under the amended Constitution of Pennsylvania, the Governor of the state, inaugurated on the third Tuesday in January, 1839, had authority to appoint a Recorder of Deeds, in place of a person appointed on the 10th of January, 1839 to fill a vacancy in that office.

A WRIT OF QUO WARRANTO was issued from this Court, returnable to the present term, requiring John Swift, Esq. to show by what warrant he claimed to have and enjoy the franchise, office, liberty and privilege of Recorder of Deeds, in and for the City and County of Philadelphia. The writ was issued on the following suggestion.

" City and County of Philadelphia, ss.

Be it remembered that George Smith, who sues for the commonwealth in this behalf, comes here into Court, and gives the Court here to understand and be informed, that by virtue of a commission, issued in the name and by the authority of the commonwealth of Pennsylvania, by David R. Porter, Governor of the said commonwealth, under the hand of the said Governor, and the great seal of the state at Harrisburg, and bearing date the seventeenth day of January, in the year of our Lord one thousand eight hundred and thirty-nine, and of the commonwealth the sixty-third, directed to the said George Smith, of the city of Philadelphia, he, the said George Smith was appointed and commissioned to be Recorder of Deeds in and for the city and county of Philadelphia, in the commonwealth aforesaid, to have and to hold, the said office of Recorder of Deeds, in and for the said city and county of Philadelphia ; together with all the rights, powers, and emoluments to the said office belonging, or by law in any wise appertaining, until the said appointment and commission shall be by the said governor or other lawful authority superseded and annulled : which said appointment and commission was accepted by the said George Smith, who on the said seventeenth day of January, A. D. 1839, duly took the oath of office, before Francis R. Shunk, secretary of the said commonwealth, by virtue of a commission of *dedimus potestatem,* to the said Francis R. Shunk, from the governor, copies of which appointment and commission

(The Commonwealth *v.* Swift.)

and official oath are hereto annexed, and which are submitted as part of this suggestion; and further, that the said George Smith has duly given bonds, with sureties approved by two of the judges of the Court of Common Pleas of the county of Philadelphia, and by the said governor, in manner and form, and conditioned according to the provisions of the several acts of assembly of this commonwealth, for the performance of the duties of the said office of Recorder of Deeds, in and for the said city and county.

And the relator further gives the Court here to understand and be informed, that notwithstanding the premises and the aforesaid appointment and commission of the said George Smith, during all the time since the date thereof as aforesaid, John Swift, hath used, and still doth use, the franchise, office, privilege and liberty of Recorder of Deeds, in and for the said city and county, and during the said time has usurped, and doth usurp upon the commonwealth therein, to the great damage and prejudice of the constitution and laws thereof. Whereupon the said relator, for the said commonwealth, doth make suggestion and complaint of the premises, and pray due process of law against the said John Swift in this behalf, to be made to answer to the said commonwealth by what warrant he claims to have and enjoy the franchise, office, liberty and privilege aforesaid."

A copy of the commission, and of the official oath taken by the relator, was annexed.

To this suggestion the following plea was filed.

" And now, that is to say, on the twenty-sixth day of January, in the year one thousand eight hundred and thirty-nine, comes the said John Swift, by William M. Meredith, his attorney, and having heard the suggestion filed in this case read, he complains that under colour of the premises in the said suggestion contained, he is greatly vexed and troubled, and that by no means justly, because protesting that the said suggestion, and the matters therein contained are insufficient in law, and that he need not, nor is he bound by the law of the land to answer thereto; yet for plea in this behalf he saith, that the said commonwealth ought not to impeach or implead him by reason of the premises in the said suggestion above specified, because he saith, that on the tenth day of January, in the year one thousand eight hundred and thirty-nine, the office of Recorder of Deeds in and for the city and county of Philadelphia, was vacant, to wit, at the city and county aforesaid, and being so vacant, the governor then and there filled the said vacancy in the said office by then and there duly appointing and commissioning the said John, in the name and by the authority of the commonwealth of Pennsylvania, to be Recorder of Deeds in and for the said city and county, to hold the

said office, together with all the rights, powers and emoluments to the said office belonging, or by law in any wise appertaining, until the said appointment and commission should be by lawful authority superseded and annulled, according to the provisions contained in the constitution of Pennsylvania, as amended by the convention of one thousand eight hundred and thirty-seven thirty-eight: which said appointment and commission, sealed with the great seal of the state, and signed by the governor, the said John brings here into Court, dated at Harrisburg the said tenth day of January, in the year one thousand eight hundred and thirty-nine. And the said John in fact saith, that afterwards, to wit, on the day and year last aforesaid, at the city and county aforesaid, he accepted the said appointment and commission, and then and there was duly bound by oath to support the constitution of this commonwealth and of the United States, and to perform the duties of his said office with fidelity, and duly gave bonds with sufficient sureties, in manner and form, and approved and conditioned according to law, for the performance of the duties of the said office, and afterwards, to wit, on the day and year last aforesaid, at the city and county aforesaid, the said John entered on the duties of his said office : and therefore, and by reason of the premises, the said John, during all the time mentioned in the said suggestion did use and exercise the office of Recorder of Deeds in and for the city and county of Philadelphia, and during all that time was Recorder of Deeds as aforesaid : and by that warrant the said John, during all the time in the said suggestion in that behalf mentioned, used and exercised the office of Recorder of Deeds in and for the city and county of Philadelphia, and all the liberties, privileges, and franchises, belonging and appertaining to the said office, as it was lawful for him to do; without this, that the said John the office, liberties, privileges, and franchises in the said suggestion mentioned, or any of them, did usurp upon the commonwealth in manner and form as by the said suggestion is supposed : All and singular which said matters and things he the said John is ready to verify, as the Court shall award : Wherefore he prays judgment, and that the aforesaid office, liberties, privileges and franchises by him above claimed, may be adjudged and allowed to him ; and that he may be dismissed and discharged by the Court here of and from the premises above charged upon him, &c."

The relator replied as follows.

"And now the said commonwealth, by J. Miles, J. M. Read and G. Mallery, attorneys, say, that for any thing before alleged in the said plea, the said commonwealth for the relator ought not to be barred from having their aforesaid suggestion and proceeding against the respondents, because protesting that the said plea and the matters therein contained, are insufficient in law to bar the said common-

wealth from having their proceeding aforesaid against him, for replication nevertheless they say, that by virtue of a commission issued in the name and by the authority of the commonwealth of Pennsylvania, by David R. Porter, governor of the said commonwealth, under the hand of the said governor, and the great seal of the state at Harrisburgh, and bearing date the seventeenth day of January, in the year of our Lord one thousand eight hundred and thirty-nine, and of the commonwealth the sixty-third, directed to the said George Smith, he the said George Smith was appointed and commissioned to be Recorder of Deeds, in and for the county of Philadelphia, in the commonwealth aforesaid, to have and to hold the said office of Recorder of Deeds in and for the city and county of Philadelphia, together with all the rights, powers and emoluments to the said office belonging, or by law in anywise appertaining, until the said appointment and commission shall be by the said governor superseded and annulled; which said appointment and commission was accepted by the said George Smith, who on the said seventeenth day of January, A. D. 1839, duly took the oath of office: and the said George Smith hath duly given bonds with sureties duly approved, in manner and form and conditioned according to the provisions of the several acts of assembly of this commonwealth, for the performance of the duties of the said office with fidelity: which said appointment and commission, official oath and official bonds, the said commonwealth here bring into Court: by reason of all and singular the premises, and the said appointment and commission, official oath and bonds the said commonwealth for the relator say, that the said appointment and commission to the said respondent by him in his plea set forth and pleaded, was by lawful authority superseded and annulled, and thereby ceased to be a legal warrant to the said respondent to hold and exercise the said right, liberty, office, franchise and privilege of Recorder of Deeds for the city and county aforesaid, and the said respondent hath usurped, and doth usurp the same, to the prejudice of the constitution and laws of this commonwealth: whereby the said commonwealth for the relator say, that the said George Smith is entitled to have and enjoy the right, liberty, office, franchise and privilege aforesaid: all of which the said commonwealth for the relator are ready to verify and prove as the Court shall award. Wherefore the said commonwealth for the relator pray judgment, and that the said defendant and respondent be convicted of the premises, and that he be ousted of and from the franchise, office, privilege and liberty of Recorder of Deeds aforesaid."

The defendant demurred to this replication, and the relator joined in demurrer.

The questions arising on this demurrer were argued on the 31st of January, 1839, by

(The Commonwealth *v.* Swift.)

Mr. *Clarkson* and Mr. *Meredith*, in support of the demurrer, and

Mr. *Miles* and Mr. *J. M. Read*, (with whom was Mr. *Mallery*,) for the relator.

Arguments in support of the demurrer.

The question raised by the pleadings in this case, is, whether the executive can remove a Recorder of Deeds, appointed since the first of January, 1839, to supply a vacancy then existing in that office.

It is necessary in examining those parts of the amended constitution that relate to this question, to keep constantly in view a fact that will not be denied, that one of the chief reasons that influenced the convention and the people in making and adopting the amendments contained in the parts referred to, was to deprive the executive of his power of appointment and removal. This we know from a comparison of the parts of the two constitutions that refer to the power of appointment. Article II., section 8.

Under the old constitution the executive had the power of appointment to every office created by the constitution, except the state treasurer, and the officers of the militia, and to every office created by law. It is well known how numerous were the offices within his gift. Under the amended constitution, all that is left of this great power, is his right to appoint a secretary of the commonwealth, an officer whose relations to the executive are so intimate, that it would be unjust to confer the appointing power on any one other than the executive. It is contended, therefore, that if the executive, or any one on his behalf under this amended constitution, in which the intention of the convention and the people is so clearly expressed to deprive him of the power of appointment and removal, asserts a right to appoint or remove, the power so to do must plainly appear in the constitution, otherwise, to carry the intention of the framers into effect, the existence of the power must be denied.

The office of Recorder of Deeds is created by article vi. section 3, of the amended constitution; and it is contended that every part of that third section went into effect on the first of January, 1839; (see section 2, of the schedule.) This Court has already so decided; for under that third section they have appointed a prothonotary of this Court. If one part of the section went into effect on that day, the whole did, unless the relator shows a good reason to the contrary. Now the last clause of the third section, confers a power of appointment on the executive if a vacancy occurs; and the appointment so made is to be until the next election, and until the appointed successor is duly qualified.

If it were the intention of the people to take away or narrow the power of appointment and removal, and the instrument is to be construed according to this intention, then, it is contended, that when a vacancy has occurred since January first, and an appointment has

(The Commonwealth *v.* Swift.)

been made to supply that vacancy, the power of the executive is exhausted, and cannot revive until another vacancy happens. And he cannot create it by a removal of the appointee, because the appointment is to be made, not during pleasure, but for a term, viz. "to continue until the next general election, and until successors shall be elected and qualified as aforesaid." Now, on the tenth of January a vacancy existed in the office of Recorder of Deeds for the city and county of Philadelphia; the executive was called on to fill it; where was his power? It is contended, that he had no power unless under this third section, and under that it was his duty to appoint and commission until the next general election, &c.; and having so done, his power was gone.

But it may be alleged that a part of the third section does not go into operation until after the next general election. How can that construction be adopted, unless there is a clear intention to that effect manifested in some part of the instrument? There is nothing like it in the words of the section, and there is no necessity for reaching such a conclusion by mere construction. If the first clause of the section is now in full force, according to the opinion of this Court, then the whole is—for any thing disclosed by the language or apparent object of the section.

But it may be alleged, that the third section is controlled by the eleventh section of the schedule, and that the correct construction of the latter leaves the appointing power as heretofore, until "the legislature shall pass such laws as may be required by the eighth section of the sixth article of the amended constitution, and until appointments shall be made under such laws." Now, it is contended, that there are but two constructions that this section of the schedule will bear.

1. That which confers an unlimited power of appointment on the executive, as to all offices, until the events mentioned.

2. That which confines it to the particular class of offices referred to in the eighth section of the sixth article.

This section of the schedule is badly framed; it is manifestly defective; standing alone, and without reference to the constitution, it would bear the first construction referred to. But it will be hardly contended by any one, that since the first of January, the executive power of appointment and removal is the same as under the old constitution, and that it will remain so until the legislature pass the laws referred to in the section, &c.

If this construction is abandoned, it would seem that no other remained but the second, which confines the power of appointment and removal to the class of officers mentioned in the eighth section of the sixth article. Now, what necessity was there for such a provision as that contained in the eleventh section of the schedule, unless to embrace that class of officers?

1. The case of vacancies in the judiciary is provided for in article

(The Commonwealth *v.* Swift.)

second, section eight; and if a vacancy occurred in this Court to-day, the executive could only nominate to the senate, and by and with their consent appoint: if there was a recess of the senate, he could appoint and commission, which commission would expire at the end of the ensuing session of the senate.

2. The case of the secretary of the commonwealth is provided for in the same article and section.

3. The cases of prothonotaries, clerks of the several Courts, recorders of deeds, and registers of wills, are all provided for in article sixth, section third.

4. In the case of justices of the peace, the executive has no power of appointment after the first of January, 1839, even to supply a vacancy. It is true that the twelfth section of the schedule mentions a power of appointment of justices " in the interim," but it clearly refers to the time intervening between the date of the amendments, February 1838, and January, 1839. It is impossible that the convention would leave a vestige of the power to appoint justices of the peace as it existed under the old constitution, and which was universally execrated. •

If this eleventh section of the schedule is construed to confer a power of appointment, coextensive with that under the old constitution, until the legislature shall pass the laws therein referred to, then these consequences will inevitably follow :—

1. All the judges, and the prothonotary of the Supreme Court, must be appointed as heretofore—the first during good behaviour, the latter during pleasure.

2. The executive may appoint justices of the peace without stint, —although it is evident in the constitution itself, that the people intended to deprive the executive of every vestige of his power of appointment as to this class of officers, even in case of a vacancy.

3. It will leave the power of appointment and removal precisely as it was under the old constitution, until such laws are passed, contrary to the evident intention of the framers of the instrument.

4. It exhibits the absurdity, that the mode of appointment of judges of this Court, and the tenure of their offices, are to depend upon whether the legislature provide by law for the appointment of an inspector of flour, tobacco, &c.

Now, the construction contended for by the respondent, is in harmony with the intention of the people, to take away all power of appointment and removal from the executive.

It was not the object of this section of the schedule to alter or modify the constitution, but to supply a defect in the constitution, and that for a time only. What was the defect? what was the time? Why, the only defect was, that officers whose election or appointment was not provided for by the constitution, were to be appointed or elected as should be provided by law ; and in the meantime the public service required that some mode of appointment should be

(The Commonwealth v. Swift.)

designated; then the eleventh section of the schedule is drawn to give it to the executive; for what time?—until the legislature shall pass the laws in question.

But what has this to do with the Recorder of Deeds? the mode of electing him, and supplying a vacancy in his office, had been already provided in the constitution in the clearest manner.

But let it be admitted that the construction of the eleventh section of the schedule includes the Recorder of Deeds, what are the words? "all officers in the appointment of the executive department shall *continue* in the exercise of the duties of their respective offices," &c., "unless their commissions shall be superseded by new appointments," &c. Now, it is contended, that if under this section the executive had a power to supersede, it was only in the case of an officer appointed under the old constitution, and whose official existence was *continued* by this section under the amended constitution. It was necessary to continue this official life, by express words, as the convention thought, and all the power they intended to confer was over this continued officer. But suppose this continued officer removed, after the first of January, under what provision is his successor be appointed to fill the vacancy?—under the third section of the sixth article; and he must be commissioned for the term there mentioned.

The respondent was appointed to supply a vacancy existing under the amended constitution, and commissioned till the next general election, &c.—he is not a *continued* officer.

It is, in the last place, contended for the respondent, that he is an officer appointed under the amended constitution for a term, and that the executive has no power to remove him. It is admitted to be settled, that where the executive has a general and absolute power of appointment, it is during pleasure, but it is denied, that under the old constitution, the executive ever claimed to remove an officer created by the constitution for a term. But the amended constitution settles that point, for it expressly provides, (article sixth, section ninth,) that officers for a term shall hold only as long as they behave themselves well, but the decision of this is not entrusted to the executive, but the section goes on to say, that they "shall be removed on conviction of misbehaviour in office or of any infamous crime."

Arguments in support of the demurrer.

It is a high compliment to the intelligence of the people and the character of our institutions, that a grave question under the new fundamental law has, within a few weeks after it has come into operation, been submitted to the silent but effective power of the judiciary. It is a momentous question in regard to the interests of the people, because several hundred offices in the state will be subjected to the decision; and it is important in a legal sense, because it is to be judged upon general principles derivable from

the instrument, without the usual lights of precedent and analogous cases, and especially novel, because from the adoption of the amendments by the convention in February, 1838, no voice of the community, bar or bench, had contended for the opposite construction, until a retiring executive, twenty days since, had suddenly sprung it forth to the astonishment of all. No better rules for the construction of the amended constitution as to this question could be furnished, than those which are well settled as to statutes. A due consideration of the old law, the mischief and the remedy, and where the *letter* was doubtful, (if so here) a reference to its spirit and intention, in view of the effects and consequences, were the true means of correct judgment. Farther, the plain legal rule applies here in force, that a Court will give effect to every statute, *if possible*, so that its *every part* shall stand, to have practical operation, and harmoniously, as to the whole, answer its respective end. This could not be, as much must be in effect obliterated, if the opposite construction were to prevail. By reviewing the constitutions of 1776, 1790, and 1838, it will appear, that in passing from one to the other, there always has been an *interregnum*, to provide for proper government; during which, and until the provisions of the new law came into *full effect*, in every part, temporary rules were provided in a "schedule," which expired when their purposes were rendered useless by the "complete operation" of the permanent provisions. Such were the schedules of 1790 and 1838, having the same objects, and differing only in such language as was necessary to meet the difference of changes; and this question fell within the schedule of 1838, as it had in 1790. The schedule was according to its preamble, "*to prevent inconvenience,*" arising from the changes, and each part of it would operate according to its subject-matter, until the permanent provision in the body of the instrument applicable to that subject-matter should come into complete operation, or take effect. In relation to one class of officers, complete provision was made in the body of the instrument itself. *In this class was the office of secretary* of state, in the appointment of the executive, and the prothonotary of the Supreme Court, in the appointment of its judges, who had, as soon as the amendments took effect on the 1st of January, 1839, but to exercise the act of appointment, and the offices went into "complete operation," by virtue of the permanent provisions made. But there was another and a larger class of offices, *i. e.* the majority of the *county* offices, (which included the Recorder of Deeds) for which the amended constitution did *not* make permanent provisions, to enable these offices to take *instant effect* on the 1st January, 1839, so that these provisions could at once completely operate. On the contrary, before the permanent provisions could completely operate, acts of the legislature regulating the election by the people, and the election itself by the people to these offices, at the general election of 1839,

were conditions precedent, and expressly necessary to the possi-bility of these provisions taking effect, or going into complete operation.  The 3d section of the 6th article declares this class of officers shall be *elected by the people*, and their tenure shall be for a term of years, if of good behaviour.  The *first* time of their *election* is not designated in the section, but is fixed in the schedule at the general election of 1839, in *such manner as shall be fixed by law*." (Sec. 10.)  Again, the 3d section, 6th article, prescribes that the legislature shall provide laws as to the number of persons who may hold offices, etc., and until such laws are passed, no election can be had.  The remaining clause on which the respondent's case rests, that " vacancies in any of the SAID offices shall be filled by appoint-ment, to be made by the governor, to continue until the *next* general election, etc," applies to vacancies in these, the *said* offices, *i. e.* those which have been first filled by popular vote, which is not the case here, the time for the first election not having arrived, and the continuance " until the *next* general election" does not mean the election of October, 1839, because it is uncertain to what date the word "next" may refer, the date of the amended constitution in convention being February 22d, 1838, the "next" general election would, on the hypothesis on the other side, be in October, 1838, which would be an absurdity, as the amendments take effect on January 1st, 1839.  The plain and sensible meaning is, the general election " next" after the passage of the laws declared to be neces-sary, and the first election under them.  The schedule (11th section) then comes in aid of this permanent provision, which applies to vacancies happening *after* the first election, and provides for vacan-cies, and the filling of these offices, during the *interregnum*, and *before* the passing of the necessary laws, and the first election; in which category is the appointment of the relator.  " The *appointing power* shall remain *as heretofore*," is a controlling clause, *limited* as to its continuance by the " complete operation" of the permanent provisions, *i. e.* the passage of laws, and the first election; and until these shall happen, the power of removal, which was before inci-dental to that of appointment, is here made express, " unless their commissions shall be *superseded* by new appointments,"—under which the respondent's appointment has been superseded.  The argu-ment of inconvenience, that the legislature will have to pass laws for *all* offices before any part of the new provisions can take effect is unsound, because each office may have its appropriate legislation, and when it can be carried into operation by its aid, the object of the permanent provisions is as to the particular office complete.

The idea that the 11th section of the schedule applies to the class of officers mentioned in the 8th section of the 6th article is erroneous. Because it does not say so. 1. It says, that " *all* officers," etc. shall continue until the legislature shall pass the laws mentioned in the 8th section of the 6th article, unless superseded, &c., and *not* that

(The Commonwealth v. Swift.)

the officers mentioned in one sentence of the 8th section, to wit, those "whose election or appointment is not provided for in this constitution" shall continue, &c. 2. It refers to *all offices in the appointment of the executive,"* that is, those at the date of the constitution, (22d February, 1838,) which included the Recorder, while the officers mentioned in section 8, article 6, are those who are not now in existence under the constitution, but which may be hereafter created, elected or appointed, " as shall be directed by law." Again, the 11th section of the schedule, in referring to the laws required by section 8, article 6, does not refer to the *officers* therein mentioned, nor do those laws therein required refer solely to this limited class of officers therein specified, but consistently with the schedule, to *all offices.* The words " any office"—" state offices" are mentioned throughout. As, then, the schedule does not refer to the limited class of officers in the 8th section of article 6, and if it does not, as we contend it does, refer to those of the 3d section of article 6, it is a *positive nullity,* an absurdity which it is impossible to impute to the framers of the amendments.

Finally, the argument *ab inconvenienti* is a strong one, especially as the preamble to the schedule evolves it. Great inconvenience would ensue on the opposite construction. There are cases in which by the existing laws which by the schedule (section 1) continue to have effect, the executive must *remove* the officer for misbehaviour (*Sec.* 2, *Act. March.* 10, 1810, *Stroud's Purd.* 756,) which cannot be, if the executive has only the power to fill vacancies, and not to supersede. Again, the officer may become insane, and the opposite construction excludes the removal of this difficulty by the exercise of the power of superseding him ; and other cases equally strong exist, while upon the construction now contended for, no difficulty can arise. The arguments on the other side as to justices of the peace are inapplicable. References were made by the counsel for the relator to *Minutes of the Convention of* 1790. *Cons. of* 1790. *Schedule, Preamble, and Arts.* 1. 3. 3 *Serg. & Rawle,* 145. *Report of Com. House Rep. on the appointing power,* 18 ; *and opinions on the point at issue recently delivered by the President Judges of Judicial Districts, Burnside, Blythe, Lewis and Banks.*

The opinion of the Court was delivered on the fourth of February by

GIBSON C. J.—Did the question depend on whether all the provisions of the eleventh section of the schedule, are applicable to the officers named in the third section of the sixth article, the respondent might have a plausible case ; for some of them, by the letter, are not; but it is impossible to say, with that degree of certainty which is requisite to judicial decision, what was meant. " The appointing

power," it is said, " shall remain as heretofore, and ALL *officers in the appointment of the executive department,* shall continue in the duties of their respective offices until the legislature shall pass such laws as may be required by the *eighth* section of the sixth article of the amended constitution." Now the words ' all officers in the appointment of the executive,' are undoubtedly broad enough to include, prothonotaries, clerks, registers of wills and recorders of deeds; but their principle of tenure and mode of selection are fixed not by the eighth but the *third* section of the article: and hence an argument that the subsequently granted power of removal is referable, not to those whose succession requires no supplemental legislation, but to the officers included in the eighth section whose manner of selection has not been fixed in the constitution. It is immaterial to the question, however, whether the contemplated election of the officers included in the eighth section, requires supplemental legislation or not. It is evident that the convention thought it did; for on no other hypothesis can we account for the fact that they were put into the schedule and classed with those whose mode of selection remained to be determined. It is else impossible to imagine why the change in respect to their offices should have been intentionally deferred till the proper details were furnished for the succession of another set, who were not necessarily coupled with them. If the passing of the laws alluded to, were not thought to be a preparatory step to the election of officers belonging to the respondent's class, why was it postponed till such laws should be enacted? It surely was not intended that the citizens of Erie should not elect their recorder of deeds till the legislature should have provided for the election of an inspector of bark in Philadelphia. Even were it certain that the election of the officers specified in the third section, requires no auxiliary legislation, it would not lessen the absurdity of making the time of legislative action, on an independent subject, the termination of incumbency under the amended constitution. If the incumbent could hold but till the legislature passed a particular law, there might be an interval betwixt its date and the ensuing election, and a consequent vacation of the office in the interim—a result which certainly was not intended. But succession to the offices specified in the third section, evidently requires auxiliary legislation, if for nothing else, to repress those frauds which have unhappily defiled the purity of our elections. The legislature is expressly directed to specify in what extent of combination different offices may be held by an individual; and it will be indispensably necessary to prescribe the duties of the return judges. If their path be not so distinctly marked as to preclude dispute, the Courts will be filled with new and useless litigation. But conceding, for the purposes of the argument, that the election of these officers needs no legislation, why were they put into the category of those whose election does? If there were no

(The Commonwealth *v.* Swift.)

reason for it, or a very absurd one, it would require us to restrain the generality of the words 'all officers in the appointment of the executive department,' and thus to deprive the respondent of the foundation of his title.   But even if they be taken, as I think they must, as actually including him, and that it be taken that he and the officers of his class shall hold till the legislature 'pass such laws as may be required by the eighth section of the sixth article,' still I cannot, for myself, see why the qualification " unless their commissions shall be superseded by new appointments,"—words as comprehensive as any which precede them—shall not equally attach themselves to his tenure.   Its limitation, as the members of the section stand, is not less explicit, nor less capricious, than if it were declared that he should hold till the legislature had passed a new militia law.   If he be at all within the words ' all officers in the appointment of the executive,' he is equally within the proviso which is the correlate of the entire member that precedes it; for it is restrained in its application by no word, circumstance, or thing, which can be supposed to have been in the view of the convention.   Why should it be supposed that it was intended to exclude these officers, standing as they do in the circumstances and necessities of their fellows, from the generality of any words whatever?   The actual intent, though susceptible of a guess, is so lamely expressed, that it is impossible to affirm any thing in regard to it.   My own impression is that the penman proceeded upon a notion that all the officers in the appointment of the executive were comprehended in the eighth section of the sixth article; and if that were so, the section would be consistent in all its parts.   But conjecture is not a sufficient ground of judicial construction.   There is an inexplicable ambiguity in the text, but one which doubtless arose from the hurry inseparable from the closing scenes of a protracted session, and which in a matter of temporary appointment, is entirely excusable.   However, did the matter rest on the special provision of the schedule alone, my own opinion would be that the respondent had failed to make out a title by it; but we all concur—and I rest the judgment of the Court on it—that any express provision to continue the functions of the executive till they should be displaced by the action of a new organ, was superfluous; and that there is another ground on which his competitor is decisively entitled.

The business of the convention was not to change the constitution but to alter it; and its individuality being retained, those parts of it which are yet to be supplanted at appointed periods, are still in force.   This is a principle not of convenience, but necessity, even in the adoption of an entire constitution whose parts are not all to go into operation at once.   A convention can do no more than mark out the principles of organic structure: the apparatus necessary to animate the mass, must be produced by acts of ordinary legislation.   Such was the predicament of the convention of 1790, which, for that purpose had

(The Commonwealth *v.* Swift.)

recourse to the old machinery by continuing, for a time, the functions of the president, executive council, and officers in the appointment of the executive under the constitution of 1776 ; and such was the predicament of the late convention, when in order to introduce the principle of judicial rotation, it ordained that the commissions of the judges under the unamended constitution, should consecutively expire at appointed periods. Now the present judicial incumbents hold their offices not by force of any conventional sanction or recognition of their tenure or mode of appointment, for the principle of the amendments is adverse to both, but by force of particular parts of the unamended constitution, whose annihilation has been simply deferred. The convention did not sanction those parts—they needed no sanction—it merely postponed the period of their extinction. When, however, an old part is supplied by a new one, the change is instantaneous and entire. Unless the contrary be distinctly specified, it admits of no intermediate state of action or being. Now, it could not have been the design of the late convention to leave to the executive, responsible as he is to public opinion for the official conduct of his officers, the power to appoint without its correlative power to remove; nor does any thing contained in the schedule, as I have attempted to show, necessarily imply it. Indeed the letter is directly adverse to it. There could be no motive to create an indefeasible tenure in the case of a class of officers, some of whom might be incapacitated by an act of Providence; and though an officer chosen by the people may also be thus incapacitated, yet the want of a power to remove him by any provision of the amended constitution, is nothing to the purpose. It is a *casus omissus*, susceptible of remedy by future amendment, which, however, could not reach the incapacity I have indicated. On this last ground, therefore, we are of opinion, that the original provisions of the unamended constitution, which give the executive a power to appoint and a power to remove, are, in their application to the present subject, still in force ; and that the demurrer be overruled.

SERGEANT, J.—The importance of the principles involved in the present case, has induced me to state the reasons why I concur in the opinion that the respondent is not entitled to hold the office of Recorder of Deeds, for the city and county of Philadelphia.

Under the constitution of 1790, recorders of deeds, together with a great number of other officers in the commonwealth, were appointed by the governor, and were removable at his will and pleasure. This power of removal was not founded, as it was at one time supposed to be, on the maxim that the power of removal was incident to the power of appointment; for there are many instances under our constitution and others, in which the power of appointment is vested in one functionary, and the power of removal in another. It is derived from those clauses of the constitution by

which the supreme executive power is vested in the governor; and he is to take care that the laws be faithfully executed. Article ii., section 1. 13. By virtue of these powers the governor is bound to carry the laws into operation which can only be done through the intervention of officers; and if these officers are not removable at his pleasure, he is relieved from that responsibility to which it is for the public good to hold him. 5 *Serg. & Rawle*, 451. It was under similar clauses in the constitution of the United States, that Congress, after considerable discussion, decided, in their first session, at the instance of Mr. Madison, who supported the doctrine by several able speeches, that the president alone had the power to remove certain officers, although the power of appointing them was vested in the president and senate. And this doctrine has been ever since adhered to. See *Serg. Const. Law*, 2d ed. 372, 412. It was also recognised as applying to the constitution of Pennsylvania when brought before this Court in the year 1820, in the case of a dispute between two persons appointed respectively by Governor Snyder and Governor Findley, *Commonwealth* v. *Bussier*, (5 *Serg. & Rawle*, 451;) and under it, the Governor for the time being has, ever since the constitution of 1790 came into operation, exercised the power of removing officers of executive appointment, when their tenure was not otherwise established by the express provisions of the constitution, or by law.

When, however, the present amended constitution of Pennsylvania was formed, in the year 1838, the convention thought fit to make a change in various officers, both as to their mode of appointment and tenure. New provisions were introduced, respecting especially that class of which the officer now in question is one, namely, prothonotaries and clerks of Courts, recorders of deeds, and registers of wills. By article six, section third, they were all, (except prothonotaries of the Supreme Court,) made eligible by the people at the general elections, and were to hold their offices for three years, if they behaved well. But inasmuch as the counties in the state differ very widely in their population and business, and in some of scanty population, it has been deemed expedient by the governor to give all these offices to one person, in other counties to divide them among two or three, and in others each office has a separate incumbent, in order to arrange the future incumbents according to the same principles, the legislature is directed by the same section, to provide by law, how many persons shall hold said offices, and how many and which of said offices shall be held by one person.

By virtue of these provisions, and the 10th clause of the schedule, the first election of these officers will take place in October 1839. All that the legislature has to do in relation to them is, to provide by law amongst how many incumbents in each county these offices shall be distributed, and to prescribe the manner of their election. This is enjoined upon them as a duty by the will of the people, authorita-

tively expressed in the convention, it is not left to the discretion of the legislature to do or omit it. It is therefore to be presumed it will be done by the legislature at its present session. When this shall have been done, the electors of each county will be able to know how many persons are to be chosen to fill these offices, and to give their suffrages accordingly; and the new system on this subject will thenceforward go into operation. From time to time thereafter, as counties may be formed or divided or may vary in population and business, the legislature may enact new laws in relation to the number of persons to occupy these offices, adapted to the changes of circumstances, provided they do not impair the term of three years as provided by the constitution.

But after arriving at this point, another question necessarily presented itself to the framers of the amendment. The officer is to be chosen and commissioned for three years. But suppose he should die, or resign, within that period, a vacancy will be thereby created, and how is that to be filled? Some officer, legally qualified, is indispensable to transact the public business. He has no deputy recognised by law as capable of taking his place; there is no officer, like the coroner in the sheriff's case, to step in and act. It would scarcely be worth while to be constantly holding special elections to fill up these vacancies. To meet this emergency then, and, as it appears to me, for that purpose only, the following provision is made in the same section. " Vacancies in any of the said offices shall be filled by appointments to be made by the governor, to continue until the next general election, and until successors shall be elected and qualified as aforesaid."

It has been earnestly contended, that this clause provides for the present case: that a vacancy had occurred in this office under the new constitution, that the governor had appointed the respondent to fill it, and that therefore he is to continue until the next general election. But it appears to me, on the best consideration I have been able to give to this and other clauses, that it applies solely to cases of vacancies occurring after the system shall have gone into operation, and the officer shall have been elected. The words of it extend no further. " Vacancies in said offices." What offices? Those which had been mentioned before—those which were to endure for three years—those to which the incumbents were elected by the people. I do not see how a vacancy can exist in an elective office till it has been once filled by an election. It was absolutely necessary to provide for such vacancies, because otherwise the office could not have been filled, and the public interest would seriously suffer. Whereas vacancies occurring in the short interval till next fall, in offices of executive appointment, were of but minor and temporary importance, and no inconvenience could result from leaving them for a time as they already stood.

Besides the officers above referred to, namely, prothonotaries and

clerks of Courts, recorders of deeds, and registers of wills, there are various others mentioned in the new constitution, and their appointment or election, and tenure, expressly designated, such as judges, secretary of the commonwealth, state treasurer, sheriffs, and coroners and justices of the peace. These may be considered as constituting a class by themselves, consisting of the officers mentioned in the constitution, and wholly or principally provided for by it. There is another large class distinct from these, consisting of officers of various denominations, established by laws passed from time to time by the legislature—some of them appointed by the governor, and holding either at his will or for a term of years ; such as heads of department, attorney general, canal commissioners, inspectors, and others, in great numbers. Others are appointed by different functionaries, such as superintendents, &c. on canals and rail-roads by the canal commissioners—inspectors of penitentiaries by the Supreme Court—keepers of prisons by inspectors—directors of the Philadelphia schools, and the members of the board of health, by the select and common councils, district commissioners, &c. &c. These, from their number and variety, are best left to the legislature to provide for : and therefore the eighth section of article sixth of the amended constitution declares, that all officers whose election or appointment is not provided for in this constitution, shall be elected or appointed as shall be declared by law.

It seems to me, that the intermediate time between the 1st January, 1839, when the new constitution commenced its operation, and the time of the general election of 1839, when the officer in question is to be elected by the people, does not fall within this 8th section, because the 10th section of the schedule declares that recorders &c., shall be elected in 1839, and therefore these officers are not left to the will of the legislature, and because these offices are in one sense of the word provided for by the 3d section of article 6, though they are not fully provided for by that section, because the intermediate time is left to stand as it was ; nothing, as has been before stated, being said about it. And it is from this equivocal sense in which the words provided for have been used in the constitution, that the difficulty in this section seems to have originated.

I therefore think that the eleventh clause of the schedule providing that all officers in the appointment of the executive shall continue until the legislature shall pass the laws required by the 8th section of article 6, does not apply to the present case, but respects only those cases where incumbents of executive appointment not mentioned in the constitution, hold under existing laws. This system is to continue ; but the legislature may repeal and alter those laws, or pass new ones, and give their appointment to the governor, or to any person or persons they deem proper, and prescribe their tenure and mode of removal.

Being then a case so far not acted upon in the text of the consti-

(The Commonwealth v. Swift.)

tution, let us look to the schedule, which is in nature of a residuary clause, embracing what may have been previously omitted. The third clause of the schedule declares, that the clauses, sections and articles of the former constitution which remain unaltered, shall continue to be construed and have effect as if the said constitution had not been amended. How was the constitution of 1790 construed and carried into effect as to the power of appointing and removing the officer in question? The governor for the time being possessed the unquestioned power of appointing and removing. By virtue of this clause, that power remains, there being no alteration of it in the amended constitution, till the election of 1839. The power of appointing justices of the peace till their election in 1840, stands entirely on this footing, and is so taken for granted in the last clause of the schedule which speaks of justices of the peace, " who may be appointed in the interim."

Considerable discussion has arisen on the words in the commencement of the 11th clause of the schedule. " The appointing power shall remain as heretofore." This phraseology is not strictly correct if taken in its broadest sense, for the appointing power of the executive is in many respects abridged or modified by the new constitution. But I think the most reasonable construction of it is, that the remainder of the appointing power shall continue as heretofore. That is to say, such portion of the appointing power, whether vested in the governor or in others, as is not taken away by this constitution, or shall not be taken away by laws passed in pursuance of the 8th section of article six, shall remain as heretofore. In this sense it applies the same enactment to the present office, and others similarly situated, which is more generally contained in the third clause of the schedule above-mentioned : namely, that as the power of the executive to appoint and remove prior to next fall is not altered by this constitution nor rendered liable to be altered by the legislature, it shall remain as heretofore.

Judgment of ouster.